IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DAVID JENNY, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>L3 TECHNOLOGIES, INC., a Delaware corporation, and L3HARRIS TECHNOLOGIES, INC., a Delaware corporation,<br><br>    Defendants. | **MEMORANDUM DECISION & ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:20-cv-00152-JNP<br><br>District Judge Jill N. Parrish |

In this action, David Jenny ("Mr. Jenny") asserts claims for disability and employment discrimination against L3 Technologies, Inc. ("L3") and L3Harris Technologies, Inc. ("L3H") (collectively, "Defendants"). Before the court is Defendants' Motion for Summary Judgment. ECF No. 32. For the reasons set out below, Defendants' Motion is **GRANTED**.

## FACTUAL BACKGROUND

This action centers around L3H's termination of Mr. Jenny's employment in November of 2019. Mr. Jenny contends that his employment was terminated because of his disability—a bacterial skin infection that he contracted in early 2018—and in retaliation for seeking disability accommodations that would have provided him favorable travel conditions.

In early 2019, Mr. Jenny was employed by L3 in the role of Senior Director of International Business Development, a position that required him to travel internationally. Generally, company

policy in effect during the relevant period required employees to fly coach on long international flights. In June 2019, Mr. Jenny began discussing with human resources a disability accommodation that would instead entitle him to be booked exit-row, business-class, or first-class seating on these flights. On August 5, 2019, Mr. Jenny formally requested such an accommodation, which was approved on August 14, 2019.

Not long after, Mr. Jenny was denied two requests to travel internationally for business. Mr. Jenny's direct supervisor, Kevin Kane ("Mr. Kane"), was allegedly involved in the denials, consulting with Keith Gentile ("Mr. Gentile"), L3H's Vice President of Strategy and Development, who had the final say. Mr. Jenny believed that the travel denials were retaliatory because Mr. Kane was upset and jealous that Mr. Jenny would be provided with more comfortable travel conditions than others in the company. Mr. Jenny also asserts that Mr. Kane showed evidence of hostility and biased attitudes towards his disability, and that such hostility may have been communicated to Mr. Gentile. Mr. Jenny complained to Defendants' human resources department in October 2019.

In 2019, L3 was in the process of merging with Harris Corporation. The merger, forming L3H, became effective July 1, 2019. After the merger (and during the period relevant to this lawsuit, which includes Mr. Jenny's termination), Mr. Gentile became Mr. Jenny's supervisor. Along with the merger also came the creation of a role for Director of International Business Development.

On October 23, 2019, Mr. Gentile held a meeting for L3H employees at the Cottonwood Country Club in Salt Lake City, Utah regarding the reorganization. During this off-site meeting, Mr. Gentile revealed his intent to place another employee—not Mr. Jenny—in the newly created role of Director of International Business Development.

At the conclusion of the meeting, Mr. Jenny approached Mr. Gentile and told him that he wanted the Director of International Business Development position. He demanded that Mr. Gentile "go fix it." The parties dispute the exact course of conversation, including what Mr. Jenny said. Mr. Jenny testified that the conversation transpired, in relevant part, as follows:

> Gentile: "I heard you didn't want the job."
> Jenny: "Well, I want the job."
> Gentile : "Well, I've sent it up the chain."
> Jenny: "Well, can't you change it?"
> Gentile: "Well, I can see. It's not approved."
> Jenny: "Well, go fix it."
> Gentile: "I'll see what I can do."

Mr. Jenny additionally testified that he told Mr. Gentile that if he couldn't "fix it" (impliedly, get him "the job" he wanted) or "find something else for [Mr. Jenny] in the company," he invited Mr. Gentile to "put a deal on the table and let's talk."

Defendants maintain that Mr. Jenny *also* told Mr. Gentile, among other things, to "package [him] out," leaving Mr. Gentile with the impression that Mr. Jenny wanted to leave L3H. Mr. Jenny denies that he said this, however, and proffers the testimony of Ryan Beard ("Mr. Beard"), a coworker of Mr. Jenny's, who was allegedly present for the off-site conversation, and who testified that there was no discussion of packaging out Mr. Jenny.

Defendants maintain that, as a result of the off-site conversation, Mr. Gentile had a good faith understanding that Mr. Jenny was unhappy with the company's post-merger organizational chart and wanted to be packaged out. Shortly after the conversation, Mr. Gentile sought approval from L3H's human resources department to add Mr. Jenny to a reduction-in-force ("RIF") list that Mr. Gentile had submitted to management prior to the off-site conversation. On the morning of October 24, 2019, L3H's Human Resources Vice President emailed Mr. Gentile, indicating that Mr. Jenny had not previously been considered for the RIF.

3

In response, Mr. Gentile called the human resources department, explaining that Mr. Jenny wanted to be packaged out. Human resources included Mr. Jenny on the RIF list, which was being finalized that same day. Part of the RIF process demanded filling out a spreadsheet called a matrix form, which Mr. Gentile completed with the assistance of Mr. Kane, Mr. Jenny's previous direct supervisor.

L3H then made plans to contact Mr. Jenny to discuss the termination of his employment. Because Mr. Gentile was out of town, Mr. Kane was asked by a human resources agent to speak with Mr. Jenny by telephone to deliver the news. Mr. Kane informed Mr. Jenny of his termination on November 7, 2019.

A year later, on November 6, 2020, Mr. Jenny filed his Complaint, alleging discrimination and retaliation claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). 29 U.S.C. § 794. Defendants move for summary judgment on the basis that Mr. Gentile, Mr. Jenny's supervisor, made the decision to terminate Mr. Jenny's employment as part of a general RIF initiative because he had a good faith understanding that Mr. Jenny wanted to be packaged out of the company. This understanding, Defendants argue, arose from the off-site conversation.

Mr. Jenny opposes the motion, arguing that a genuine dispute as to material facts regarding Mr. Gentile's conversation with Mr. Jenny—and Mr. Gentile's resultant mental state or good faith in terminating Mr. Jenny's employment—exists, and that a rational trier of fact could find L3H's proffered rationale for Mr. Jenny's termination to be mere pretext for unlawful discrimination and retaliation.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co*., 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation omitted). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (cleaned up).

In any case, a plaintiff "must still identify sufficient evidence requiring submission to the jury," *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *accord Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005), where such evidence offered is in admissible form. *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1191 (10th Cir. 1998). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### DISCUSSION

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Jones v. Barnhart*, 349 F.3d 1260, 1265 (10th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255)); *accord Daniels v. UPS*, 701 F.3d 620, 627 (10th Cir. 2012). Accordingly, the court cannot stray into the province of the jury by weighing the evidence presented by the parties. Additionally, the court does not attempt to determine how it would find the facts if it were to sit as trier of fact. *See Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1377 (10th Cir. 1988).

Instead, this court only circumscribes the range of conclusions that a reasonable jury could reach in order to determine whether each party's arguments fall within its ambit, or whether reasonable jurors might disagree about factual determinations and the proper verdict. Where reasonable jurors might disagree, summary judgment is inappropriate. *Id.*; *accord Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

### I.      Claim One: ADA (Discrimination)

#### A. Applicable Standard

In support of his first claim, pleaded under the ADA's anti-discrimination provision, *see* 42 U.S.C. § 12112, Mr. Jenny seeks to show employment discrimination by circumstantial, rather than direct, evidence. As a result, Mr. Jenny's claim is subject to the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Turner*, 563 F.3d at 1142; *Ramsey v. Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990).

This three-step analytical framework first demands that a plaintiff carry his initial burden of establishing a prima facie case of the elements of the discrimination claim. *Ramsey*, 907 F.2d at 1007. The court begins by outlining the necessary elements of an ADA discrimination claim before considering whether Mr. Jenny has made such a prima facie case. It then turns to the next two steps of the *McDonnell Douglas* framework.

### B. ADA Claim Elements

The ADA prohibits employment discrimination against any "qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). "A prima facie case of ADA discrimination consists of three elements: that the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability. *Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007); *Kellogg v. Energy Safety Servs.*, 544 F.3d 1121, 1124 (10th Cir. 2008).

Here, Defendants do not dispute for purposes of this Motion that Mr. Jenny was disabled within the meaning of the ADA, nor do they seem to dispute his qualifications to perform the essential functions of his job. Instead, Defendants argue that Mr. Jenny has failed to make a prima facie case that "the circumstances surrounding the adverse action give rise to an inference of [disability] discrimination." *Id.* at 14 (quoting *Carter v. Pathfinder Energy Servs, Inc.*, 662 F.3d 1142 (10th Cir. 2011)).

### C. Discussion

#### 1) Step One

While the Tenth Circuit has stated that a prima facie case must be established by a preponderance of the evidence, *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013), it has

also consistently emphasized that the burden at Step One is "not onerous," *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), and has similarly described the Step One burden as "relatively lax." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

Mr. Jenny first asserts that he has demonstrated a prima facie case of discrimination by virtue of the temporal proximity between Mr. Gentile learning of Mr. Jenny's disability and the termination of Mr. Jenny's employment. In support of this contention, Mr. Jenny points to Tenth Circuit precedent holding that "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013); *accord Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 (10th Cir. 2008) (applying temporal proximity analysis at Step One to an ADA discrimination claim).

Because Mr. Jenny's employment was terminated ten weeks after Mr. Gentile learned of his disability, Mr. Jenny would have this court conclude that temporal proximity, standing alone, is sufficient to make out a prima facie case of discrimination. But the Tenth Circuit, in *Vilsack*, made clear that "where along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid." 707 F.3d at 1181-82 (citing *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (suggesting that "two months and one week" was "probably too [long] . . . to establish causation by temporal proximity alone")). And, following *Meiners*, this court concludes that the ten weeks at issue here between a protected activity (or supervisors' knowledge of the disability) is too long to establish, by itself, causation by temporal proximity for the purposes of making a prima facie case. *See* 359 F.3d at 1231.

At the same time, however, the ten-weeks' temporal proximity moves the ball towards Mr. Jenny's establishment of a prima facie case. To nudge his prima facie case across the line, Mr. Jenny first points to the fact that multiple travel requests were denied shortly after he requested or received his accommodation. Such past events, while not capable of independently supporting discrimination or retaliation claims, Mr. Jenny argues, may nonetheless serve as "background evidence" supporting a prima facie case. *Accord Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014).

Taken together, the close temporal proximity of Mr. Jenny's request for an accommodation and his termination from employment, coupled with the additional "background evidence" of other acts adverse to Mr. Jenny's interests and, in the case of the travel denials, conceptually related to his disability, may very well clear the "not onerous," *Orr*, 417 F.3d at 1149, "relatively lax," *Annett*, 371 F.3d at 1241, bar set by the Tenth Circuit for establishing a prima facie case under Step One of the *McDonnell Douglas* framework. And so, for the purpose of resolving Defendants' Motion, the court continues to Step Two and Step Three of *McDonnell Douglas*. However, as discussed below, regardless of whether Mr. Jenny makes a prima facie case, he fails to adduce sufficient evidence to support a favorable jury verdict under the principle set forth in *Reeves*.

**2)  Step Two**

Under the *McDonnell Douglas* order of operations, if a plaintiff succeeds in establishing a prima facie case, "the burden shifts to the employer to proffer a legitimate non-discriminatory purpose for the adverse employment action." *Tabor*, 703 F.3d at 1216-17 (quotation omitted). Under *McDonnell Douglas* Step Two, the employer's "burden is one of production, not persuasion." *Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 601 (10th Cir. 2014) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000)) (unpublished). Step Two requires only

that the employer offer "admissible evidence sufficient for the trier of fact to conclude that petitioner was fired" for the asserted reason. *Reeves*, 530 U.S. at 142-43. The employer's burden is "exceedingly light," *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899-900 (10th Cir. 2017), as its stated reasons need only be legitimate and non-discriminatory "on their face." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011); *DePaula*, 859 F.3d at 970.

Here, L3H offers as its legitimate, non-discriminatory grounds for the termination of Mr. Jenny's employment Mr. Gentile's understanding that Mr. Jenny was unhappy that Mr. Gentile wanted to put someone else in the new Director of International Business Development role and, as a result, that Mr. Jenny asked to be packaged out. Because Mr. Jenny concedes that L3H has provided a non-discriminatory reason for the termination of his employment, the court does not scrutinize the sufficiency of L3H's rationale under Step Two and instead proceeds to *McDonnell Douglas* Step Three to interrogate whether a reasonable jury could find Defendants' proffered rationale to be mere pretext for disability discrimination.

### 3) Step Three

Where an employer makes the offering required under Step Two of the *McDonnell Douglas* framework, a plaintiff will avoid summary judgment only if he shows his disability was a determinative factor in the employment decision or shows the employer's explanation for its action was merely pretext. *See Tabor*, 703 F.3d at 1216-17. To meet this requirement at *McDonnell Douglas* Step Three, Mr. Jenny argues that L3H's proffered justification for his termination was "not the true reason for the employment decision." *Tabor*, 703 F.3d at 1218; *Orr*, 417 F.3d at 1149.

Such a Step Three showing must be "by a preponderance of the evidence," *DePaula*, 859 F.3d at 970, with "record support" and by rendering the Defendant's proffered reasons "to be so

weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find them unworthy of credence." *DePaula*, 859 F.3d at 973 (cleaned up).

Critically, and is discussed below, merely showing that the proffered termination rationale is unreliable or false is not enough to support a jury verdict for the employee in all cases. "[T]here will be instances where, although the plaintiff has established a prima facie case *and* set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148 (emphasis added).

In conducting this analysis, the court is cautious not to act as a "super personnel department" or second-guess good-faith business judgments. *Young*, 468 F.3d at 1250; *see also Turner*, 563 F.3d at 1144; *accord Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("The relevant inquiry is not whether their proffered reasons were wise, fair or correct, but rather we ask whether they believed those reasons to be true and acted in good faith upon those beliefs.") (internal quotations omitted and cleaned up).

In support of his pretext argument, Mr. Jenny first argues that temporal proximity and the occurrence of related events, including, for example, his two travel requests being denied shortly after his receipt of an accommodation, demonstrate that L3H's proffered rationale for his termination was pretextual. Because temporal proximity between L3H learning of Mr. Jenny's disability and his termination may support a finding of pretext when combined with other evidence, it serves to provide some support for Mr. Jenny's arguments at Step Three. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015) (citing *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013); *accord Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007).

Mr. Jenny also contends that a jury could find that Mr. Gentile did not sincerely believe that Mr. Jenny wanted to leave the company because (1) witness testimony additionally undermines Mr. Gentile's good faith belief that he wanted to be packaged out; (2) there is a lack of documentation supporting Mr. Gentile's claim that he believed Mr. Jenny wanted to be packaged out; and (3) Mr. Gentile made contradictory and inconsistent statements about the reasons for Mr. Jenny's termination.

All of this taken together, Mr. Jenny argues, undermines Mr. Gentile's claim that he sincerely believed that Mr. Jenny wanted to be packaged out. This, in turn, Mr. Jenny argues, creates a triable factual dispute regarding L3H's *true* motivation for his termination. L3H argues, on the other hand, that a rational trier of fact would have no choice but to believe that Mr. Gentile understood that Mr. Jenny wanted to leave, and that his subsequent termination of Mr. Jenny's employment was in good faith.

The court is of the view, however, that the course and disputes regarding the conversation *alone* may provide sufficient basis for a jury to reject as false L3H's proffered, nondiscriminatory rationale for Mr. Jenny's termination. To briefly repeat again the course of the conversation, as Mr. Jenny reports it happened:

> Gentile: "I heard you didn't want the job."
> Jenny: "Well, I want the job."
> Gentile : "Well, I've sent it up the chain."
> Jenny: "Well, can't you change it?"
> Gentile: "Well, I can see. It's not approved."
> Jenny: "Well, go fix it.
> Gentile: "I'll see what I can do."

Mr. Jenny additionally testified that he told Mr. Gentile that if he couldn't "fix it" (impliedly, get him "the job" he wanted) or "find something else for [Mr. Jenny] in the company," he invited Mr. Gentile to "put a deal on the table and let's talk."

While the parties dispute what, exactly, was said during the course of the conversation, when the evidence is viewed in the light most favorable to Mr. Jenny, a rational trier of fact could understand that Mr. Gentile may not have reasonably understood that Mr. Jenny wanted to be terminated immediately and without further discussion—that is, without a deal being put on the table and without talking. This is true even if, under Defendants' version of events, Mr. Jenny said "package me out and I'll go somewhere else in the company, but if the offer is good, I'll take it," which may be understood to be requesting further discussion about movement within the company, as opposed to leaving L3H altogether.

Thus, finding near-immediate, unilateral termination without negotiations or further communication to be an unreasonable or implausible interpretation of Mr. Jenny's request at the country club, a reasonable jury could find L3H's subsequent rationale for Mr. Jenny's termination to be implausible because Mr. Gentile "didn't really believe" that Mr. Jenny wanted to be packaged out. *Dewitt*, 845 F.3d at 1307.

While the ultimate fact of discrimination may, in some cases, be properly reached from the falsity of the employer's explanation by itself, *Reeves*, 530 U.S. at 147, such a showing of a false explanation at Step Three is not always adequate to support a jury's finding of liability. *Id*. at 148. On this point, *Reeves* is exceptionally clear:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id*.

The court is satisfied that the instant case represents such an instance. Even if the court were to accept that a prima facie case has been made at Step One, and even if the jury were to conclude that Defendants' proffered rationale were false, there is yet insufficient evidence tying Mr. Jenny's termination to the fact of his *disability itself* (or, under the retaliation claim, his request for accommodations). The inference of discrimination that might plausibly guide Mr. Jenny's claim through the prima facie analysis is not enough to support a reasonable jury's verdict, as *Reeves* contemplates.

Instead, the record reveals some other, nondiscriminatory reason for the employer's decision. By the undisputed evidence, Defendants' intent to terminate Mr. Jenny was formed only after the country club conversation. This is shown by the undisputedly rushed nature in which Mr. Jenny was added to the RIF list immediately after the conversation at the country club, as well as the correspondence from human resources signaling a lack of any intent to terminate him before that point. And, by all accounts (even by the account of a proffered third-party witness, as discussed below), the country club conversation did not involve, in any way, any fact related to Mr. Jenny's disability or request for accommodations. While the parties dispute exactly what was said during that conversation, neither suggests that Mr. Jenny's disability was at play.

At oral argument, Plaintiff argued that there might have nonetheless been some intent to terminate Mr. Jenny's employment later for some other pretextual reason. But this is mere conjecture, *Dewitt*, 845 F.3d at 1307, and relies on speculation rather than citation to any record evidence. The evidence cited by Plaintiff for his Step One and Step Three arguments simply cannot support a favorable verdict by a reasonable jury and, even taken together, constitutes no more than a scintilla of evidence. *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020).

14

While the court does not search for direct evidence of discrimination—hence the application of *McDonnell Douglas* in the first place—it nonetheless searches for sufficient evidence to support an inference that it was ultimately Mr. Jenny's disability, as opposed to anything else, that caused his termination. Yet the court is unable to find such record evidence.

The true reason for Mr. Jenny's termination may or may not have been a request to leave the company. But the uncontroverted evidence nonetheless could not support a reasonable inference that Mr. Gentile had any intention to terminate Mr. Jenny's employment prior to the country club conversation or that would have arisen as a result of Mr. Jenny's disability. That is, even if Mr. Gentile terminated Mr. Jenny simply because, for example, he believed he was unpleasant, or otherwise insubordinate, or for any reason may have wanted to prove a point following the country club conversation, the record evidence suggests that the reason for the termination was something other than discrimination. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169 (10th Cir. 2007).

Likewise, any and all evidence surrounding Mr. Kane or his purported biases, even if true, is inapt because there is no genuine dispute that he was not the decisionmaker responsible for the termination. Even if Mr. Kane helped Mr. Gentile fill out the matrix form or knew that the matrix form meant that Mr. Jenny's employment was going to be terminated, Plaintiff does not adduce sufficient admissible evidence to create a genuine dispute as to whether Mr. Kane exercised any meaningful agency or sufficient influence in the termination decision. No rational fact-finder could conclude on the basis of the evidence on record that Mr. Kane's biases, communicated to Mr. Gentile, could have been the true cause for the termination of Mr. Jenny's employment.

In sum, the jury could not find that the cause of the termination was disability discrimination without merely speculating. Such a verdict, resting on Mr. Jenny's proffered

evidence and inferential theories, would come down to conjecture lacking sufficient record evidence. *Dewitt*, 845 F.3d at 1307. Thus, the court concludes that summary judgment is appropriate.

### D.  Mr. Beard's Testimony

The court also considers the parties' arguments regarding the admissibility of the testimony of Mr. Beard, whom Mr. Jenny proffers as a witness to his off-site conversation with Mr. Gentile. Mr. Beard testifies that he was present during the conversation and that "there was no discussion by either person of packaging out Jenny, Jenny requesting a severance package, or Jenny stating he wanted to leave if he was not put in Emeney's role." Defendants object to Mr. Jenny's reliance on Mr. Beard's testimony for two reasons. First, they argue that Mr. Beard's statements and testimony are inadmissible hearsay. Second, they argue that, because Mr. Jenny has already admitted that he asked for "a deal," he cannot now undermine his own testimony through that of another witness.

As to the first issue (regarding hearsay), the court has no difficulty concluding that Mr. Beard's testimony is not hearsay under black-letter hearsay doctrine. Mr. Beard's testimony regarding what was said or not is not offered for the truth of the matter asserted. In other words, it is not offered to show what Mr. Jenny wanted or did not want, but rather only to show what Mr. Jenny said or did not say to Mr. Gentile. Thus, such testimony falls without the definitional ambit of hearsay. *See* FED. R. EVID. 801(c)(2).

To the second point (that Mr. Jenny cannot contradict his own testimony through that of another witness), Defendants point to a portion of Mr. Jenny's deposition in which he stated that he said the following to Mr. Gentile: "I said if he couldn't fix it, I want to go somewhere else in the company. If he can't find something else for me in the company, put a deal on the table and

16

let's talk." Additionally, Defendants point to Mr. Jenny's statement, in response to the question "was anyone else around" for the country-club discussion with Mr. Gentile, "it was just him and I." Because Mr. Beard's testimony, by Defendants' understanding of the evidence, contradicts both of these statements, Defendants argue that it is being offered to create a sham issue.

In support of this argument, Defendants cite *Vesom v. Atchison Hosp. Ass'n*, 279 Fed. App'x. 624 (10th Cir. 2008) (unpublished), for the proposition that Jenny may not "create a sham fact issue" by contradicting his own sworn testimony. *Id*. at 633 (citing *Burns v. Bd. of County Comm'rs of Jackson County, Kan.*, 330 F.3d 1275, 1282 (10th Cir. 2003). But Defendants stretch the Tenth Circuit's "sham issue" doctrine out of shape. While sham affidavits may be given no consideration, not all contradiction or inconsistency gives rise to a finding that such affidavits are shams. Indeed, *Vesom* itself makes clear that "an affidavit will not be disregarded merely because it conflicts with a prior sworn statement." *Id*.; *accord* 10B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2738, at 334 ("[A] witness'[s] affidavit will not be automatically excluded because it conflicts with the witness'[s] earlier or later deposition."). Additionally, *Burns*, on which the unpublished *Vesom* relies, outlines a number of factors to be considered by the court in determining whether an affidavit presents a sham issue,[1] 330 F.3d at

---

[1] "Factors to be considered in determining whether an affidavit presents a sham issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Burns*, 330 F.3d at 1282 (internal quotation and quotation marks omitted). This court's determination of whether an affidavit is directed to creating a sham issue is reviewed for abuse of discretion. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001).

1281-82, and contains an admonition to view the evidence in the light most favorable to the nonmovant. *Id.* at 1283.

More importantly, both *Burns* and *Vesom* are distinguishable because they involve an affiant's attempt to alter or undermine *his own* testimony through later affidavits. *Vesom*, 279 Fed. App'x at 633 ("Rider's second affidavit directly contradicts his previous deposition statements under oath."); *Burns*, 330 F.3d at 1281-82 (regarding a plaintiff's attempt to "correct" his own deposition answers through an errata sheet submitted pursuant to FED. R. CIV. P. 30(e)). The remainder of Tenth Circuit opinions discussing this issue reviewed by the court similarly arise in this context of an affiant's attempt to contradict his own testimony. *See, e.g.*, *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1223 n.1 (10th Cir. 2000); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Nickola v. Storage Tech. Corp.*, 160 F. App'x 658, 659 n.1 (10th Cir. 2005); *Bohn v. Park City Grp.*, 94 F.3d 1457, 1463 (10th Cir. 1996). Defendants fail to cite to any authority that testimony from a third-party witness cannot be used to contradict the testimony of a party under the sham affidavit doctrine.

Defendants also rely on *Young v. Vincent*, 310 F.2d 709 (10th Cir. 1962), which states that a party's called witnesses "can neither weaken nor strengthen plaintiff's case as against a directed verdict." *Id.* at 712. But *Young* makes clear that such "additional evidence" is only ineffectual insofar as it "seriously conflict[s]" with a party's own testimony when viewed as "its most favorable version." *Id.* Additionally, *Young* has been clarified by subsequent Tenth Circuit opinions, which establish that the seemingly broad proposition of law set forward in that case is in effect "when [a] plaintiff's own testimony *undisputedly establishes* contributory negligence as a

matter of law." *Sandoval v. U. S. Smelting, Ref. & Mining Co.*, 544 F.2d 463, 468 (10th Cir. 1976) (emphasis added).

A similar standard is set out in *Anderson-Prichard Oil Corp. v. Parker*. 245 F.2d 831, 834 (10th Cir. 1957) ("[W]hen a party testifies to positive and definite facts which, if true, would *defeat his right to recovery or fix liability upon him*, he is bound by this testimony.") (emphasis added); *accord Kan. Transp. Co. v. Browning*, 219 F.2d 890, 893 (10th Cir. 1955) ("Moreover, where a plaintiff personally testifies to a set of facts which *clearly preclude* his recovery, he is bound thereby even though other witnesses called in his behalf contradict him and testify to facts which would permit his recovery.") (emphasis added).

Here, Mr. Jenny's allegedly contradicted testimony is certainly not dispositive—it would not undisputedly establish any sort of fault, neither would it defeat or clearly preclude his right to recovery. The ways in which Mr. Beard's testimony conflicts with that of Mr. Jenny may be ameliorated through reasonable inferences and certainly do not concede Mr. Jenny's case. *Young* has simply never been read for the broad principle that Defendants to seek to glean from it. The court declines to read *Young* as creating an evidentiary rule in which any conflict between the testimony of a party and a party's proffered witness leads to the exclusion of evidence.

At bottom, however, because Mr. Beard's testimony does not introduce the fact of Mr. Jenny's disability or his request for an accommodation to the calculus of the country club conversation, it does not raise any inference of disability discrimination or retaliation. While the testimony may provide additional support for the conclusion that Defendants' stated rationale for Mr. Jenny's termination was false, it does not contribute to Mr. Jenny's burden of concluding that the termination was discriminatory for the reasons set out above. Assuming (without deciding) that the testimony would be admissible, it nonetheless does not save Mr. Jenny's case.

19

## II.  Claim Two: ADA (Retaliation)

Mr. Jenny's second claim is pleaded under a provision of the ADA that forbids retaliation against any individual for engaging in a protected activity. *See* 42 U.S.C. § 12203(a). Retaliation claims under the ADA, like discrimination claims under that statute, follow the *McDonnell-Douglas* framework laid out above. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). The elements of such a claim, including those that must be established in a prima facie case at *McDonnell Douglas* Step One, are that a plaintiff (1) engaged in protected activity and (2) was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity, and that (3) a causal connection exists between the protected activity and the adverse employment action. *Id*.

Here, the protected activities at issue include Mr. Jenny's request for a disability accommodation and his October 2019 complaint to human resources regarding L3H's decisions to deny him travel following his receipt of a disability accommodation. Defendants move for summary judgment as to this claim by arguing that, because Mr. Gentile was not aware of Mr. Jenny's complaint to human resources when he decided to terminate Mr. Jenny's employment, no causal connection existed between the protected activity and Mr. Jenny's termination. However, because "a *request* for accommodation can constitute protected activity supporting a retaliation claim," *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016) (emphasis added), and because evidence has been proffered tending to show that Mr. Gentile would have been aware of Mr. Jenny's request for (and receipt of) an accommodation, Defendants' argument fails.

But summary judgment is nonetheless appropriate here for the same reasons as discussed above in relation to Mr. Jenny's discrimination claim. There is simply no evidence tethering the adverse employment action to any fact relating to Mr. Jenny's request for accommodation. A jury

would be forced to rely on mere conjecture and speculation in reaching a verdict favorable to Mr. Jenny.

### III. Claim Three: Section 504

As to Mr. Jenny's Third Cause of Action, pleaded under Section 504, because the Rehabilitation Act and ADA "impose identical obligations on employers," *Cummings v. Norton*, 393 F.3d 1186, 1190 n.2 (10th Cir. 2005) (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1124 (10th Cir. 2000)); *accord Rivero v. Bd. of Regents*, 950 F.3d 754, 758 (10th Cir. 2020), summary judgment as to that claim is granted for the same reasons as discussed above with regard to Mr. Jenny's ADA claims.

### IV. As to L3 Technologies

Finally, Defendants move for summary judgment as to Defendant L3 Technologies, which had merged to create L3H by July 1, 2019, before Mr. Jenny's claims arose. Defendants argue that L3 could not be liable for Mr. Jenny's adverse employment action as it had ceased to exist. As Defendants note, Mr. Jenny does not, in his opposition memorandum, contest that L3 is entitled to summary judgment and could not have been responsible for the adverse employment action. Thus, the court concludes that summary judgment is independently appropriate as to L3 on all claims. *See J.W. v. Utah*, 647 F.3d 1006, 1012 (10th Cir. 2011) (affirming the district court's granting of summary judgment on grounds of lack of personal participation where the evidence showed the named defendant was not responsible for the placement decision).

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 32, is **GRANTED**.

DATED February 23, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge